IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DEWALT,<br>    Plaintiff, | )<br>)<br>) |
| vs. | )   C.A. No. 24-2 Erie<br>) |
| THE CITY OF ERIE, ANDREW ZIMMERMAN, and PENNSYLVANIA ELECTRIC CO.,<br>    Defendants. | )   District Judge Susan Paradise Baxter<br>)<br>)<br>) |

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Pending before the Court is Defendant Pennsylvania Electric Company's ("Penelec") Motion to Dismiss Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [ECF No. 22]. Plaintiff filed a brief in opposition to Penelec's motion [ECF No. 28], and Penelec submitted a reply brief [ECF No. 35]. Upon review of the above and the analysis set forth below, the Court grants Penelec's Motion to Dismiss.

**A.    Relevant Factual History**

As a preliminary matter, "'when a state agency acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." Univ. of Tennessee v. Elliott, 478 U.S. 788, 799 (1986). A hearing officer's factual findings are considered *prima facie* correct. See e.g., D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010); Edmundson v. Borough of Kennett Square, 4 F.3d 186, 193 (3d Cir. 1993)(in determining whether to give preclusive effect to agency fact-

1

finding, courts must weigh the rights at stake, the power of state procedures, and their adequacy in "highly specialized areas"). Therefore, this Court includes a detailed factual background which is consistent with the findings of the Pennsylvania Public Utilities Commission ("PaPUC"), unless otherwise detailed.

Plaintiff John Dewalt owns a residential property located at 546 Lincoln Avenue / 1704 W. 6th Street, Erie, PA 16505 ("the Property"). (ECF No. 18 at Exhibit C). The Property has a unique historical use: it was originally constructed as a two-family dwelling and, for much of its existence, operated as such, with separate utilities, living quarters, and entrances for each unit. (ECF No. 23-4 at 67-70). Under prior zoning ordinances, two-family dwellings were permitted in the area, and the Property itself was once zoned accordingly. (ECF No. 35-1 at 10). However, sometime before 2013, the two-family use was abandoned and the City of Erie issued a zoning certificate designating the Property as a single-family dwelling. (ECF No. 23-4 at p. 67). Despite this reclassification, the Property retained its dual-utility infrastructure, including two natural gas meters (serviced by National Fuel), two water meters (serviced by Erie Waterworks), and segregated electrical wiring with separate service panels for each unit. (*Id.* at p. 75). The second electrical meter had been removed by Plaintiff's father—the prior owner—when the Property was occupied by only one household. (*Id.* at p. 67).

In 2013, Plaintiff's father sought to revert the Property to its original two-family use and applied for a zoning variance, which was denied by the Erie Zoning Hearing Board. (*Id.*). Plaintiff renewed his father's efforts in 2023, filing another application for a use variance to reclassify the Property as a two-family dwelling. (*Id.*) The Zoning Hearing Board again denied the request, citing that the proposed use was not permitted in the R-1 residential zoning district. (*Id.*)

2

Also in 2023, Plaintiff determined that the Property's aging electrical system required upgrades due to safety concerns, including a frayed entrance cable, degraded insulation, and outdated four-circuit fuse boxes. (ECF No. 23-4 at 17). He obtained an electrical permit from the City of Erie, outlining his plan to reinstall the second meter socket and bring the entire system up to current code standards. (*Id.* at 85). The permit application was submitted with guidance from Sam Santana, the City's designated electrical inspector, and approved. (ECF No. 35-1 at p. 6, ¶10). Plaintiff then proceeded with the upgrades, consulting Santana throughout the process to ensure compliance with the National Electric Code. (*Id.*). Upon completion of the permitted work, Plaintiff requested a final inspection from the City of Erie, which was required to authorize Penelec to place and energize the second meter. However, the City refused to inspect the final work product, citing zoning non-compliance.

Plaintiff then retained EKE Services, a West Virginia-based licensed electrical inspector, who confirmed the work met National Electric Code standards. (ECF No. 35-1 at ¶ 24). However, the City of Erie—having adopted the Uniform Construction Code (UCC)—only recognizes inspections performed by its designated inspector (Santana) or Building Inspection Underwriters of PA (BIU). (*Id.* at ¶¶ 3, 5). Further, Rule 6 of Penelec's tariff provides: "Penelec will not connect or furnish electric service ... unless a written certificate of approval, satisfactory to the Company, has been received from a competent inspection agency *authorized to perform this service in the specific locality* in which service is to be provided." (ECF No. 23-5 at p. 3). Thus, EKE's inspection was not valid for the purpose of authorizing Penelec to begin its work.

### B. Relevant Procedural History

Plaintiff's Amended Complaint asserts four counts against Penelec: Count I - violation of substantive due process; Count II - violation of procedural due process; Count III - violation of equal protection; and Count IV – promissory estoppel under Pennsylvania state law.

Penelec raises several arguments in support of its motion to dismiss: (1) this Court lacks subject matter jurisdiction because the PaPUC retains exclusive jurisdiction over disputes involving utilities; (2) the doctrines of claim and issue preclusion bar the Plaintiff's claims because the issues and claims in question were already litigated and resolved by the PaPUC; (3) the Plaintiff has failed to adequately allege or demonstrate that Penelec acted "under color of state law," a necessary element for any claim brought under 42 U.S.C. § 1983; and (4) even if the Court were to reach the merits of the Plaintiff's § 1983 claims, those claims fail to state a cause of action upon which relief may be granted. Each of these arguments will be addressed in turn.

## II. DISCUSSION

### A. Jurisdiction Under Fed. R. Civ. P. 12(b)(1)

A Rule 12(b)(1) motion challenges the federal court's "very power to hear the case." Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). Under Rule 12(b)(1), the plaintiff is the party invoking a federal court's jurisdiction and therefore bears the burden of showing its claims are properly before the court. Id. Under Rule 12(b)(1), a challenge can be either a facial or a factual challenge. Petruska v. Gannon Univ., 462 F.3d 294, 302, n.3 (3d Cir. 2006). Challenge to subject matter jurisdiction is "facial" when, as here, a motion to dismiss is filed prior to an answer and asserts that the complaint is jurisdictionally deficient on its face. When considering such a challenge a court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff. See PBGC v. White, 998 F.2d 1192, 1196 (3d Cir.1993).

4

Penelec contends in its reply brief that the PaPUC enjoys exclusive jurisdiction over this dispute, thereby precluding this Court from adjudicating Plaintiff's claims. ECF No. 35 at 4. While the Court agrees that the PaPUC possesses *original* jurisdiction over utility service disputes—and that primary jurisdiction principles often require initial deference to the agency—Penelec has not identified, nor can the Court locate, any authority supporting the proposition that the PaPUC's jurisdiction is *exclusive* in the sense of permanently ousting judicial review.

Pennsylvania law unequivocally establishes the PaPUC as the proper forum for initial adjudication of disputes involving utility services, including matters of service denial, rates, and infrastructure. Einhorn v. Philadelphia Elec. Co., 410 Pa. 630, 634 (1963) ("a long list of decisions of this Court make it clear that all matters between public utilities and customers (including rates, installation of utility facilities and all compensation for service rendered to customers are initially vested in the Commission.") The doctrine of primary jurisdiction further reinforces that courts should defer first to administrative agencies when the dispute involves technical or policy questions within the agency's specialized competence. MCI Telecommunications Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1106 (3d Cir. 1995).

Critically, however, primary jurisdiction is not a jurisdictional limitation—it is a prudential doctrine governing the order of decision-making, not the availability of judicial review. U.S. v. Philadelphia National Bank, 374 U.S. 321 (1963) (primary jurisdiction postpones, rather than extinguishes, judicial authority); U.S. v. Henri, 828 F.2d 526, 527 (9th Cir. 1987) ("[T]he doctrine of primary jurisdiction ... does not speak of the jurisdictional power of the federal courts."). Thus, the law does not suggest that the PaPUC's original jurisdiction is so exclusive as to forever bar courts from reviewing final agency decisions or related claims. To the contrary, state and federal courts routinely exercise jurisdiction over matters that originate

before administrative bodies once the administrative process concludes. See e.g., Laveson v. Trans World Airlines, 471 F.2d 76, 79 (3d Cir. 1972)("A court-made doctrine, primary jurisdiction holds that in some cases, courts should not render a decision–exercise their jurisdiction–until certain issues have been passed upon by the appropriate administrative agency".)

Here, the PaPUC has already fulfilled its role as the initial adjudicator, rendering a final decision after hearings, witness testimony, and evidentiary submissions. [ECF No. 23-4]. Because the administrative process is complete, the Court is not divested of jurisdiction. Penelec's argument conflates original jurisdiction with exclusive jurisdiction in a manner unsupported by statute or precedent. The Court therefore retains authority to evaluate Plaintiff's claims under the appropriate standard of review.

**B.      Fed. R. Civ. P. 12(b)(6): Standard of Review**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court accepts as true all well pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court need not accept as true unsupported conclusions and unwarranted inferences. Doug

Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000). Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft, 556 U.S. at 678.

In deciding a motion to dismiss, courts generally consider only the allegations contained in the complaint, any exhibits attached to the complaint, and matters of public record. Pryor v. Nat'l Collegiate Athletic Assoc., 288 F.3d 548, 560 (3d Cir.2002). Courts also may consider a document that a defendant attaches as an exhibit to a motion to dismiss, if the authenticity of the document is undisputed and the plaintiff's claims are based on the document. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). Further, while a court must accept all factual allegations in Plaintiff's complaint as true, courts are not compelled to accept "unsupported conclusions and unwarranted inferences." See Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 417 (3d Cir.1997), or "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986).

### 1.  Collateral Estoppel and Res Judicata

Penelec argues that the issues and claims in this case are barred by the doctrines of collateral estoppel and/or *res judicata* because they were already litigated and resolved by the PaPUC. Federal courts have long recognized that the doctrines of collateral estoppel and *res judicata* may apply to final administrative determinations where those determinations result from judicial-style proceedings. Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966). An agency acts in a judicial capacity when it provides the parties with (i) representation by counsel; (ii) pretrial discovery; (iii) the opportunity to present memoranda of law; (iv) the opportunity to examine and cross-examine witnesses; (v) the opportunity to introduce exhibits; (vi) the chance to object to

evidence; and (vii) final findings of fact and conclusions of law. Exxon Co., U.S.A. v. Amerada Hess Pipeline Corp., 83 F.E.R.C. ¶ 63,011 at p. 65,095 (1998) (reversed on other grounds).

Here, all of the elements of a judicial style proceeding are present. Penelec and Plaintiff were represented by counsel (ECF No. 23-4 at 2), provided discovery and exhibits (Id. at 4-5), presented memoranda of law (ECF No. 23-3), examined and cross-examined witnesses (ECF No. 23-4 at 3), objected to evidence (See e.g., Id. at 118), and the agency provided a final findings of fact and conclusions of law (ECF No. 35-1). Thus, the doctrines of collateral estoppel (issue preclusion) and *res judicata* (claim preclusion) may apply and are analyzed below.

### a. Collateral Estoppel (Issue Preclusion)

The Third Circuit applies a four-part test for collateral estoppel: (1) the issue decided in the prior adjudication must be identical to the one presented later; (2) there must have been a final judgment on the merits; (3) the party against whom estoppel is asserted must have been a party or in privity with one in the prior proceeding; and (4) that party must have had a full and fair opportunity to litigate the issue previously. Greenleaf v. Garlock, Inc., 174 F.3d 352, 357–58 (3d Cir. 1999).

Here, Penelec's collateral estoppel argument fails at the first prong because the constitutional issues before this Court were never litigated or decided by the PaPUC. The PaPUC's adjudication addressed only whether Penelec properly refused to install a second meter under its Tariff Rule 6 based on compliance with local construction code inspection requirements. The ALJ concluded that Penelec acted properly because the inspection by EKE was not authorized under Erie's UCC enforcement scheme—a determination grounded entirely in state utility regulations without any constitutional analysis. By contrast, Plaintiff's federal § 1983 allegations raise fundamentally different questions about whether the City of Erie or Penelec by

8

their application of the governing rules deprived him of a protected property interest without adequate process or through arbitrary government action. These constitutional issues fall well outside the PaPUC's jurisdiction. See Califano v. Sanders, 430 U.S. 99, 109 (1977) ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures ....")[1]

### b. *Res Judicata* (Claim Preclusion)

Pennsylvania law demands the convergence of four conditions before claim preclusion may take hold: identity in (1) the subject matter sued upon; (2) the cause of action; (3) the parties to the action; and (4) the legal capacity of those parties. Duquesne Slag Prods. Co. v. Lench, 490 Pa. 102, 105 (1980); Bearoff v. Bearoff Bros., 458 Pa. 494, 497 (1974). Yet the doctrine is no blunt instrument; our courts have long rejected rigid formalism in favor of a pragmatic inquiry into whether the underlying dispute has been fully aired. See Bream v. Pennsylvania State Univ., 2022 WL 2816518, at *2 (3d Cir. 2022), citing McArdle v. Tronetti, 627 A.2d 1219, 1222 (Pa. Super. Ct. 1993)); See also Gregory v. Chehi, 843 F.2d 111, 118 (3d Cir. 1988). A plaintiff cannot evade preclusion merely by repackaging a single grievance into new legal theories—what matters is whether the claims spring from a common transactional core.

---

[1] It bears emphasis that while Plaintiff's due process claims arise from the same factual predicate—namely, Penelec's refusal to install and energize a second meter following the City of Erie's non-approval of EKE's inspection—this shared factual foundation does not equate to identity of issues for collateral estoppel purposes. See e.g., McLaughlin v. Fisher, 2002 WL 35652678, at *3 (M.D. Pa. May 20, 2002) (distinguishing § 1983 issues from previously litigated administrative hearing issues.)

Even if this court were to conclude that collateral estoppel would otherwise operate to preclude the federal constitutional claims, the application of collateral estoppel is not automatic. One limitation to the application that has been "repeatedly recognized" is "that the doctrine of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." Allen v. McCurry, 449 U.S. 90, 94 (1980), citing Montana v. United States, 440 U.S. 147, 153 (1979).

First, the subject-matter identity requirement turns on the alleged wrong. Here, that alleged wrong is unmistakable: Penelec's refusal to install and energize a second meter. That singular act anchors both suits, and relitigating it would demand the same witnesses and evidence. See Helmig v. Rockwell Mfg. Co., 131 A.2d 622, 626 (1957). Indeed, Plaintiff has already sought to depose Andrew Zimmerman in this action [ECF No. 31], after previously cross-examining him at length in the PaPUC proceeding. (See ECF No. 23-4 at 3).

Second, the cause of action is the same. Plaintiff's grievances—nepotism, cronyism, and the meter refusal—are unchanged, and no new material facts have been alleged. But crucially, not all relief was available in the first forum. As the Third Circuit has held, preclusion is inappropriate where "barriers prevented [a plaintiff] from seeking full redress initially." Beasley v. Howard, 14 F.4th 226, 234 (3d Cir. 2021), quoting V.V.V. & Sons Edible Oils Ltd. v. Meenakshi Overseas, 946 F.3d 542, 546 (9th Cir. 2019)). It is beyond dispute that the PaPUC, by its nature, could not grant the monetary or injunctive relief Plaintiff now pursues.

The PaPUC's proceedings are designed to resolve utility-service disputes with efficiency and expertise, balancing consumer protection against the need for reliable energy delivery. They operate on streamlined procedures—limited discovery, expedited hearings, and remedies focused on corrective orders rather than damages. But that very efficiency comes with trade-offs: the agency's statutory mandate does not extend to adjudicating every legal consequence of a utility's conduct, nor can it award the full spectrum of judicial relief. To treat its determinations as preclusive would force plaintiffs to choose between an expedited fix and their right to comprehensive redress—a choice the law does not compel. Cf. Frazier v. King, 873 F.2d 820, 824 (5th Cir. 1989) (rejecting preclusion where an administrative forum lacked jurisdiction over § 1983 claims).

10

Preclusion thus fails on transactional fairness grounds. Where, as here, a plaintiff had "good reason" to pursue an initial action that could not deliver complete relief, the law does not demand an impossible choice between administrative recourse and a day in court. Beasley v. Howard, 14 F.4th 226, 235 (3d Cir. 2021) ("Assertions of claim preclusion are readily denied when the remedies sought in the second action could not have been sought in the first action.") (internal citations omitted.)[2]

### B. Under Color of State Law

Before the Court is the question of whether Plaintiff has sufficiently alleged that Penelec, a private utility company, acted "under color of state law" in refusing to install and energize a second electrical meter at his property. For the reasons that follow, the Court concludes that Plaintiff has failed to meet this threshold requirement for its 42 U.S.C. § 1983 claims.

To state a claim under § 1983, a plaintiff must demonstrate both a deprivation of a federally protected right and that the deprivation was caused by conduct fairly attributable to the state. Gomez v. Toledo, 446 U.S. 635, 640 (1980). The "color of state law" requirement serves as a critical gatekeeping function, ensuring that § 1983 liability attaches only to those actions that reflect the exercise of governmental power rather than purely private conduct. West v. Atkins, 487 U.S. 42, 48 (1988).

The Courts have developed several doctrinal approaches to assess whether private conduct may be deemed state action. See e.g, Brown v. Philip Morris Inc., 250 F.3d 789, 801 (3d Cir. 2001) (discussing the applicable color of law tests). First, the public function test requires the court to determine whether the defendant was performing a function that is "traditionally and

---

[2] Preclusion would negate the administrative agency's role as the primary forum, given its limited remedial authority and discourage claimants from using the streamlined administrative process altogether. See, 18 Charles Alan Wright et al., Federal Practice and Procedure § 4412 (3d ed. 2021)

exclusively" the province of the state. Leshko v. Servis, 423 F.3d 337, 343 (3d Cir.2005). The requirements of the public function test are "rigorous" and "rarely...satisfied." Robert S. v. Stetson School, Inc., 256 F.3d 159, 165 (3d Cir.2001).

Second, the close nexus test considers whether there exists such a substantial connection between the state and the challenged action that the conduct may be fairly treated as that of the state itself. Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974). Third, the joint action or symbiotic relationship test asks whether the government has "insinuated itself into a position of interdependence with the defendant." Brown v. Philip Morris Inc., 250 F.3d 789, 803 (3d Cir. 2001).

Regardless of what test is ultimately applied, the object of the inquiry is to determine whether a private entity has exercised powers traditionally reserved exclusively to the government, Jackson, 419 U.S. 345, 352, (1974), or whether "the defendant exercised power possessed by virtue of [federal] law and made possible only because the wrongdoer is clothed in the authority of [federal] law." Groman v. Township of Manalapan, 47 F.3d 628, 639 n. 17 (3d Cir.1995) (citations omitted). The Plaintiff's theory of liability hinges on the claim that Penelec refused to install a second electric meter not due to its own policies, but because of improper pressure from a city official. This argument is unpersuasive for several reasons, each of which is supported by the record—including Plaintiff's own Exhibit D (ECF No. 18 at 22).

*Public Function Test*

A private entity may qualify as a state actor when it exercises "powers traditionally exclusively reserved to the State." Jackson, 419 U.S. at 449. It is not enough that the federal, state, or local government exercised the function in the past, or still does. And it is not enough that the function serves the public good or the public interest in some way. Rather, to qualify as a

traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally and exclusively performed the function. Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 809 (2019).

The law regarding public utilities under this test is clear. In *Jackson*, the Supreme Court equated the question of whether something is a public function with the question of whether the particular state imposed a duty to perform the relevant function. Jackson, 419 U.S. at 353. In that case, the Court refused to hold that providing utility services is state action under the public function test, because "while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities it imposes no such obligation on the State. The Pennsylvania courts have rejected the contention that furnishing of utility services is either a state function or a municipal duty." Id. at 353; See also Mark v. Borough of Hatboro, 51 F.3d 1137, 1144 (3d Cir. 1995).

*Close Nexus Test*

In *Jackson*, the Supreme Court held that a private utility company's termination of service was not state action unless there was a "sufficiently close nexus" between the state and the company's conduct to deem the latter "fairly treated as that of the State itself." *Jackson*, 419 U.S. at 351. The Court emphasized that mere regulation or licensing of a private entity is insufficient to establish state action. The state must be directly responsible for the specific conduct challenged, such as through overt encouragement or delegation of a traditionally public function.

Here, Penelec's refusal to install the meter was compelled by its filed tariffs and the UCC, not by any alleged interference from city officials.[3] Under Penelec's Tariff Rule 6, electrical service may only be provided upon receipt of an inspection certificate from an

---

[3] It would be absurd for this Court to assume that Penelec would have acted against its Tariff, in a discretionary manner, and installed the meter with an invalid inspection. Furthermore, the record suggests that Penelec was in the process of evaluating whether or not to install the meter when Zimmerman appeared.

authorized local agency. [ECF No. 23-6]. It is undisputed that the Plaintiff displayed a certificate from EKE, an entity not recognized to perform inspections in the City of Erie. Thus, regardless of any communications with city officials, Penelec was independently prohibited from proceeding with the installation under its own policies.

Even assuming, *arguendo*, that City Official Zimmerman engaged in improper conduct, Plaintiff has failed to demonstrate that Penelec acted as a willful participant in any unlawful directive, as opposed to a regulated entity complying with neutral obligations. The ALJ record confirms that Zimmerman communicated with Penelec employee Ryan Bogle during Penelec's on-site assessment of the Property for meter installation. (ECF No. 23-4 at 39). Critically, however, Penelec's refusal to install and energize the meter was independently justified under its authorized regulatory duties—grounds upon which it expressly relied. (See ECF No. 18 at Exhibit D). Thus, no actionable nexus exists between Zimmerman's alleged misconduct and Penelec's lawful exercise of its own discretionary authority.

*Symbiotic Relationship Test*

The Third Circuit's decision in Crissman v. Dover Downs Ent. Inc., 289 F.3d 231, 241 (3d Cir. 2002), clarifies the *Burton* "symbiotic relationship" test for state action. See Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961). Under *Burton*, if a sufficiently interdependent relationship exists between a private entity and the state, then the private party's conduct may be "fairly attributable" to the state—not because the state directly compelled the action, but because the parties' intertwined interests render the private actor an extension of government authority. *Crissman* 289 F.3d at 241. The analysis is fact-intensive, requiring courts to "sift[] facts and weigh[] circumstances" to determine whether the state's involvement imbues private conduct with the "color of law." Id. at 234, quoting Burton, 365 U.S. 715 at 722 (1961).

14

Here, Plaintiff alleges that Penelec's refusal to install the second meter constitutes state action because of an interaction between a Penelec employee and Zimmerman. The crux of Plaintiff's theory is that this exchange created a "meeting of the minds" sufficient to transform Penelec's decision into governmental conduct.

The facts here, when viewed in Plaintiff's favor, do not support a Burton-style symbiotic relationship. The record reveals that a Penelec employee, upon being approached by Zimmerman, reviewed the inspection documentation and followed Penelec's own tariff obligations. While the employee did show the documents to Zimmerman, he still independently concluded that the meters could not be energized because the inspections were not conducted by the City of Erie or BIU—not solely because Zimmerman objected. The employee explicitly states (in part):

> "The [inspection stickers] were dated 6/04/23 and were not from the City of Erie or BIU. Although the upgrade of the electric service here meets the CGES, [the meter] shouldn't be energized until approval from the City of Erie is received. [The second meter] should be put on hold as well pending review from the City of Erie's electrical inspector, as it was inspected by someone other than the City or BIU."

(ECF No 18 at Exhibit D). This language demonstrates that Penelec's decision was based on its own internal compliance protocols as it relates to requisite inspections and not blind deference to Zimmerman's zoning concerns. While Zimmerman's intervention may have prompted the additional review, the ultimate determination rested on Penelec's independent assessment of the inspection—a routine application of utility policy, not evidence of a "joint beneficial enterprise" with the City.

The critical distinction lies in Penelec's unilateral decision-making: the employee reviewed the inspection documents, applied Penelec's internal policies, and reached an independent conclusion based on the utility's requirements—not Zimmerman's directives. At

most, Zimmerman's objection served as a catalyst for Penelec to exercise its own judgment, much like a customer complaint might trigger a routine review. That is the essence of private business operations, not state action. The complete absence of any ongoing coordination, mutual benefit, or delegation of authority between Penelec and the City forecloses any finding of a "symbiotic relationship" under *Burton*. Without more, a single interaction—where a private entity applied its own policies—cannot satisfy the "color of law" requirement a threshold issue for its § 1983 claims.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Penelec's motion to dismiss [ECF No. 22] as to Plaintiff's 42 U.S.C. § 1983 claims. Because these federal claims fail to state a cognizable cause of action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claim for promissory estoppel under 28 U.S.C. § 1367(c)(3).

An appropriate Order follows.